# EXHIBIT A

DATE FILED: December 13, 2016 4:30 PM
FILING ID: 726F9FD158010

| | |
|---|---|
| DISTRICT COURT, BOULDER COUNTY, STATE OF COLORADO<br>1777 6th Street<br>Boulder, CO 80302<br>(303) 441-3750 | CASE NUMBER: 2016CV31387<br><br><br>∆COURT USE ONLY∆ |
| Victoria J. Marschner,<br><br>**Plaintiff,**<br><br>**v.**<br><br>USAA Casualty Insurance Company, a Texas corporation,<br><br>**Defendant.** | Case Number:<br><br><br>Division: |
| Attorney for Plaintiff:<br>James A. Cederberg, #8920<br>Cederberg Law Firm, P.C<br>1200 28th St., Ste. 302<br>Boulder, CO  80303<br>Telephone: 303-499-0449<br>Facsimile:  303-499-0542<br>jim@cederberglaw.com | |
| **COMPLAINT FOR BREACH OF INSURANCE CONTRACT  AND FOR STATUTORY REMEDIES UNDER C.R.S. 10-3-1115 and 1116** | |

Plaintiff, Victoria J. Marschner, by and through her attorney, Cederberg Law Firm, P.C., by James A. Cederberg, hereby submits her Complaint for Breach of Insurance Contract and for Statutory Remedies under C.R.S. 10-3-1115 and 1116, ("Complaint") as follows:

1

1.     On or about May 10, 2014, on Colorado Highway 93 at Washington Avenue in Jefferson County, Colorado, a 2008 Nissan Altima driven by Nicholas R. Nather struck the rear of a 2014 Subaru Forester driven by the plaintiff Victoria J. Marschner with such force as to push the Subaru forward into the rear of a 2012 Ford Escape driven by Anna Haug.

2.     At the said date and location, Nicholas R. Nather operated his motor vehicle negligently and carelessly and failed to slow down or stop before colliding with the rear of the plaintiff's vehicle and pushing it into the vehicle ahead.

3.     Nicholas R. Nather's negligence and carelessness caused bodily injuries to the plaintiff, Victoria J. Marschner.

4.     The force of the collision between the plaintiff's vehicle and the vehicle ahead was sufficient to cause the front airbags in the Subaru Forester to deploy, including the driver knee airbag.

5.     When it deployed in the collision, the driver knee airbag impacted the plaintiff's right knee, causing serious damage to the knee.

6.     As a direct and proximate result of the negligence of Nicholas R. Nather, plaintiff suffered injuries to her neck and injuries to her right knee. The injuries to plaintiff's right knee included implosion of the medial femoral condyle of her right leg. This injury made the knee joint extremely painful and unable to function and resulted directly and proximately in knee replacement surgery. Due to her injuries and the resulting knee replacement surgery, the plaintiff was subjected to a prolonged period of impaired function, limitation of her normal activities, extreme

2

physical plain and emotional distress, hospitalization prolonged, extended and

difficult rehabilitation, physical therapy and other treatment. She incurred medical

and related expenses in excess of $124,078.93.

7.      Because his negligence resulted in the injuries and damages to plaintiff,

Nicholas R. Nather was legally liable for the damages sustained by plaintiff.

8.      At the time of the collision on May 10, 2014, the plaintiff Victoria J.

Marschner was the named insured under USAA Casualty Insurance Company

Colorado Auto Policy number 0014460 62C 7102 0, issued by the defendant

(hereinafter "policy").

9.      Defendant USAA Casualty Insurance Company ("USAA") is a Texas

Corporation authorized to do business and doing business in Colorado.

10.     The said policy was issued to the plaintiff in Boulder County, Colorado.

11.     At all material times, the defendant USAA Casualty Insurance Company

acted or failed to act by and through its agents, servants and employees.

12.     At all material times, Jennifer Soto and Glenn J. Reece were employees

of USAA acting within the course and scope of their employment.

13.     The identity of Auto Injury Solutions and whether it is a distinct legal entity

has not been disclosed to plaintiff or her counsel.

14.     To the extent Auto Injury Solutions is a distinct legal entity, it nevertheless

was at all times an agent of the defendant USAA Casualty Insurance Company,

and its acts or failures to act are on law those of the defendant.

15.     The policy included Medical Payments Coverage of $100,000 per person.

16.     Effective January 7, 2014 to May 14, 2014, the Policy included Amended

Declarations establishing Uninsured Motorists Bodily Injury coverage limits of $300,000 per person and $500,000 per accident.

## FIRST CLAIM FOR RELIEF
### Breach of Contract - Medical Payments Coverage

17.     Plaintiff incorporates by reference into this First Claim for Relief paragraphs 1 through 16 of her Complaint, and paragraphs 25 through 138, below.

18.     Pursuant to the Medical Payments Coverage included in the said Policy, defendant USAA Casualty Insurance Company (hereinafter "USAA" or "defendant") was contractually obligated to pay the plaintiff's reasonable health care expenses for bodily injury caused by an automobile accident, up to the $100,000 coverage limit.

19.     Plaintiff incurred reasonable health care expenses caused by the May 10, 2014 collision in excess of $124,078.93.

20.     Plaintiff has complied with and satisfied all reasonable and enforceable terms and conditions of the Policy.

21.     Pursuant to its Medical Payments coverage, defendant paid or reimbursed medical expenses of approximately $34,162.39.

22.     Defendant repeatedly failed and refused to pay other reasonable health care expenses incurred by plaintiff as a result of the collision which, if properly paid under the policy, would have exhausted the medical payments limit.

23.     By failing and refusing to pay for reasonable health care expenses incurred by plaintiff beyond the $34,162.39, defendant has breached its contractual obligation under the Medical Payments coverage of the policy.

4

24.    As a result of defendant's failure and refusal to pay additional medical payments benefits, plaintiff has been damaged in the amount of approximately $65,837.61.

## SECOND CLAIM FOR RELIEF
**Breach of Contract for Failure to pay Underinsured Motorist Benefits**

25.    Plaintiff incorporates by reference paragraphs 1 through 24 of her Complaint, and paragraphs 39 through 138, below.

26.    Pursuant to the terms of the Uninsured Motorist Coverage of the policy, uninsured motorist coverage includes underinsured motorist coverage.

27.    Pursuant to the Policy, the defendant is contractually obligated, under the underinsured motorist coverage, to pay the plaintiff bodily injury damages that are the result of a not at fault accident with an underinsured driver, up to its Uninsured Motorist Coverage limit of $300,000.

28.    Also under the Policy, a motorist is considered underinsured if his liability coverage is not enough to pay the full amount that defendant's insured is legally allowed to recover as damages.

29.    As a result of the negligence of Nicholas R. Nather, and the extent of her injuries caused by the May 10, 2014 collision, the plaintiff Victoria Marschner is legally allowed to recover damages for elements that include past and future medical expenses, non-economic damages for pain and suffering, emotional distress, disruption of life, and related losses, and damages for physical impairment. The reasonable value of these damages likely exceeds $450,000.

30.    Nicholas R. Nather had in effect at the time of the collision a policy automobile insurance with Country Financial, with bodily injury liability limits of

5

$50,000.

31.     Nicholas R. Nather was therefore an underinsured motorist within the meaning of the policy.

32.     Pursuant to the terms of the policy, the defendant is contractually obligated to pay the plaintiff the amount she is legally allowed to recover as damages from the underinsured driver, up to the amount of the defendant's Uninsured Motorist Coverage limit of $300,000.

33.     Defendant agreed to pay, and did pay plaintiff, on or about August 17, 2016, $130,000 under its Uninsured Motorist Coverage.

34.     Defendant failed and refused to pay the plaintiff underinsured motorist benefits beyond the $130,000.

35.     Plaintiff's damages that she is allowed to recover require payment of the entire USAA underinsured motorist limit of $300,000.

36.     By failing and refusing to pay any amount of the underinsured motorist claim beyond the $130,000, the defendant has breached its contractual obligation to plaintiff under Underinsured Motorist endorsement of the Policy.

37.     As a result of the defendant's breach of its contractual obligations under the Uninsured Motorist Coverage, the plaintiff has been damaged in the amount of $170,000.

### THIRD CLAIM FOR RELIEF
### Claim for Statutory Relief Pursuant to C.R.S. 10-3-1115 and 1116-
### Unreasonable Delay and Denial of Medical Payments

38.     Plaintiff incorporates by reference paragraphs 1 through 37 of her Complaint, and paragraphs 105 through 138, below.

32.     On May 10, 2014, immediately after the collision, the plaintiff was attended to by an ambulance crew from American Medical Response.

33.     The ambulance crew confirmed that plaintiff's front air bags had deployed.

34.     The ambulance crew documented that the plaintiff's complaints included neck pain and right knee pain, and that they found a bruise on plaintiff's right shin.

35.     After being transported by ambulance from the collision scene, plaintiff was treated at St. Anthony Hospital on May 10, 2014, where she complained of neck pain, lower back pain, chest tenderness, right knee and right shin pain.

36.     On physical examination at St. Anthony Hospital on May 10, 2014, plaintiff was found to have a large area of contusion over the right anterior shin.

37.     The plaintiff's diagnosis at St. Anthony Hospital on May 10, 2014 were cervical strain and right knee/right lower leg contusion.

38.     On May 13, 2014, the plaintiff followed up with her primary care physician, Hillary L. Browne, M.D. Dr. Browne noted that at that time the plaintiff's knees, shoulders and back were hurting and her ears were ringing, and she complained of headache. Dr. Browne felt that Ms. Marschner had a whiplash injury and referred her for a physical therapy consult. Dr. Browne noted a large hematoma in the anterior tibial area and stated: "large hematoma will take months to go away but I think the knee is probably ok".

39.     On May 30, 2014, Victoria Marschner was seen by Michael P. Wertz, M.D., orthopedic surgeon. Dr. Wertz noted that she had contusions to the patella

7

and pretibial areas of her right and left lower extremities. Dr. Wertz's advice was to see how she improves over the next 3 to 4 weeks, and consider injecting the knees with corticosteroid if she is not improving.

40.      Ms. Marschner was seen again by Dr. Wertz on July 15, 2014. At that time, he noted that plaintiff's knees had not recovered since the collision. He reviewed x-rays taken 5/30/14 and noted that Ms. Marschner has a cystic lesion in the medial femoral condyle in the right knee that was not present on MRIs on previous radiographs prior to the collision.

41.      Dr. Wertz, in his July 15, 2014 note, expressed concern that the cystic lesion in the medial femoral condyle was post traumatic related to a small fracture that could not be seen on the x-rays, and he ordered an MRI of the knee for a closer look.

42.      The MRI of Victoria Marschner's right knee, ordered by Dr. Wertz on 7/15/14, was performed on 7/18/14 and read by Roger D. Nichols, M.D., radiologist.

43.      Dr. Nichols read the 7/18/14 MRI of Victoria Marschner's right knee as showing "subchondral collapse (involving) the posterior weight-bearing aspect of the medial femoral condyle... A 16mm AP x 10mm mediolateral focus of significant chondral loss and subchondral collapse is noted with subcortical bone marrow edema. The subchondral collapse and bone marrow edema are new from the previous study" (referring to a previous MRI of 11/5/13).

44.      Dr. Wertz saw the plaintiff on July 22, 2014. Dr. Wertz' diagnosis on 7/22/14 included: "Subchondral bone collapse questionably related to avascular

8

necrosis (AVN) or trauma right knee."

45.    Dr. Wertz' assessment on 7/22/14 stated:

Etiology of this medial femoral condyle collapse is not entirely clear. She
did have a traumatic event occurring in a motor vehicle accident in which
the airbags went off, and she had a sudden blow to the knees. This is
when the pain started, I question whether this is a fracture or related to
some sort of avascular necrosis (AVN) and cystic change. It could be
both. She, unfortunately, has significant articular incongruency in the
medial compartment now. I doubt whether further arthroscopic
debridement and osteochondral grafting of this would be that helpful. She
does have significant chondral surface damage in the patella femoral
articulation…"

46.    Dr. Wertz' plan on 7/22/14 was as follows:

My suggestion would most likely be to convert this to a total knee -
arthroplasty given that she is going to be at high risk for developing
lateral compartment disease. I do not think this cystic change will heal,
and I think that given her weight and stresses that she puts on the knee
that a joint replacement would be the best alternative at this time.

47.    On July 24, 2014, Victoria Marschner returned for follow up with Dr.

Browne, her primary care physician. Dr. Browne entered the following note: "AVN

of the right knee the obvious cause is the trauma of that accident (referring to

"MVA on May 10th)…."

48.    On July 25, 2014 Dr. Wertz had a further visit with Victoria Marschner to

discuss knee replacement surgery. Dr. Wertz noted:

We went over the etiology of subchondral bone collapse that can occur
after trauma and is likely related to loss of the blood supply to the
subchondral bone. This seems to be the situation in her case, in that she
was involved in an under dash airbag injury in which the knees were
struck, She had no symptoms prior to that event…

49.    Also on July 25, 2014, Dr. Wertz discussed with Ms. Marschner deferring

the knee replacement surgery until she returned from a planned trip to Europe,

and giving her a hyaluronate injection to get her through the next 4 to 6 weeks.

9

50.     On August 12, August 19, and August 26, 2014, the plaintiff received a series of orthovisc injections in her knees from Dr. Wertz.

51.     On August 13, 2014, Victoria Marschner obtained a second opinion from C. Brian Blackwood, M.D., orthopedic surgeon. Dr. Blackwood also recommended a total knee replacement.

52.     On December 2, 2014, the plaintiff underwent a right total knee replacement.

53.     After the knee replacement surgery, the plaintiff underwent routine post-surgical physical therapy.

54.     In addition to the routine post-surgical physical therapy, Ms. Marschner's post-knee replacement course was complicated. She experienced prolonged swelling, stiffness and restriction of motion and had to undergo extensive additional physical therapy and rehabilitation.

55.     All of the plaintiff's care and treatment resulted in charges for the medical and related services, facilities and appliances provided in her treatment.

56.     Documented expenses for the plaintiff's evaluation, care and treatment of injuries sustained in the May 10, 2014 collision, including the knee replacement surgery and rehabilitation are at least $124,078.93.

57.     At all material times, the adjustor assigned to handle the Medical payments claim on behalf of USAA was Jennifer Soto.

58.     USAA initially paid the medical expenses arising from the May 10, 2014 collision, including Dr. Wertz's services through August 26, 2014.  USAA paid a total of $34,162.39 under the medical payments coverage.

59.    Plaintiff timely submitted documentation of her medical expenses to USAA for all expenses claimed in this Complaint.

60.    USAA denied payment of and has failed and refused to pay any medical expenses for the knee replacement surgery, associated hospitalization, rehabilitation and related expenses.

62.    As the purported basis for its denial of benefits, Ms. Soto and USAA provided the plaintiff a document dated April 16, 2015 purporting to be a review of medical necessity and casual relationship to the accident of medical expenses submitted by plaintiff, bearing the electronic signature of Dr. Ninad Sthalekar, who was not otherwise identified ("Sthalekar review").

63.    The Sthalekar review stated that services for December 2, 2014, the knee replacement surgery, "was not medically necessary."

64.    As the total of its purported basis of decision, the Sthalekar review stated:

> Primary total knee replacement (TKR) is most commonly performed for knee joint failure caused by osteoarthritis (OA); other indications include rheumatoid arthritis (RA), juvenile RA, osteonecrosis, and other types of inflammatory arthritis. The aims of TKR are relief of pain and improvement in function. Candidates for elective TKR should have radiographic evidence of joint damage, moderate to severe persistent pain that is not adequately relieved by an extended course of nonsurgical management, and clinically significant functional limitation resulting in diminished quality of life. In patients with RA and other inflammatory arthropathies, additional disease-specific therapies may be needed to achieve control of disease activity before proceeding with the surgical procedure.
>
> *However, in this case the diagnosis of osteoarthritis is not secondary to motor vehicle accident.*
>
> In conclusion, I do not recommend reimbursement for treatment rendered on 12/02/14 [for list of cpt codes] as I do not find treatment medically reasonable or necessary. ...

11

Criteria:
This recommendation is supported by:
http://consensus.nih.gov/2003/2003TotalKneeReplacement117html.htm

65.　　This purported rationale, and the web site cited, have absolutely nothing to

do with the particular facts and circumstances in Ms. Marschner's injury that

resulted in her having knee replacement surgery in December of 2014.

66.　　The fact that Victoria Marschner had a previous surgery on her knee to

remove and repair damaged cartilage and may or may not have progressed to

need a knee replacement at some indefinite point in the future, if ever, does not

negate the severe damage to the knee sustained in the May 10, 2014 collision as

the direct and proximate cause of her knee replacement surgery of December 2,

2014.

67.　　The Sthalekar review provided absolutely no evidence to contradict the

proposition stated in the preceding paragraph.

68.　　Plaintiff has incurred medical expenses as a result of the May 10, 2014

collision that substantially exceed the $100,000 medical payments coverage limit

provided by the policy.

69.　　Dr. Sthalekar is not identified as to qualifications, specialty, experience, or

affiliation with USAA and Auto Injury Solutions.

70.　　Dr. Shtalekar's review did not provide a reasonable basis for the denial of

benefits under the medical payments coverage.

71.　　By June 17, 2015, the plaintiff had obtained counsel, and on that date

plaintiff's counsel sent a letter via facsimile to USAA, asking, among other things,

12

whether USAA acknowledges that the knee replacement and related medical expenses were caused by the collision.

72.     Ms. Soto and USAA responded by denying additional rehabilitation expenses that had been submitted and attaching a document dated June 23, 2015 that was essentially a verbatim repetition of the Sthalekar review of April 16, 2015 quoted above, with the conclusion sentence modified to read: "However in this case the diagnosis of osteoarthritis is not secondary to the motor vehicle accident therefore the surgery or post-operative therapy would not be indicated.

73.     This response similarly failed to provide any reasonable basis for the denial of medical payments benefits.

74.     Plaintiff provided USAA with a letter from Dr. Wertz etc. dated May 15, 2015 in which Dr. Wertz clearly stated that the May motor vehicle collision caused additional damages that made the knee replacement necessary.

75.     USAA denied additional therapy and rehabilitation expenses and other expenses related to the knee replacement on June 24, 2015, attaching another copy of the June 23 version of the Sthalekar review.

76.     This June 24, 2015 document also failed to provide any reasonable basis for denying medical benefits.

77.     On December 29, 2015, plaintiff's counsel wrote similar letters to Ms. Soto,  Glenn Reece (the adjuster on the UM claim) and USAA, reporting that Dr. Wertz had re-confirmed his opinions expressed in the May 10, 2015 letter, and that Dr. Wertz suggested more detailed information about the structural damage

13

sustained in the collision may be available from the radiologist.

78.     Also in the December 29, 2015 letters, plaintiff's counsel informed Ms.

Soto, Mr. Reece and USAA of a meeting with the radiologist, Dr. Roger Nichols,

who read the July 18, 2014 MRI and the December 5, 2013 MRI for comparison,

and provided Dr. Nichols' description of the structural damage and its mechanism

and significance.

79.     The mechanism explained by Dr. Nichols showed how an impact to the

shin, with the leg in a flexed position while she was driving, would impart force to

the head of the femur consistent with the implosion seen in the MRI.

80.     The December 29, 2015 letter informed Ms. Soto, Mr. Reece and USAA

that:

> This evidence, particularly the MRI images, prove clearly that your
> position denying that the MVA caused the knee replacement is dead
> wrong and needs to be corrected. The collapsed medial femoral condyle
> is a far cry from the previous cartilage damage and left Ms. Marschner
> with no choice to undergo knee replacement in 2014, much more
> prematurely than if the collision had not occurred.

81.     The December 29, 2015 letter also promised to provide a video of Dr.

Nichols displaying and explaining the MRI.

82.     On February 19, 2016, plaintiff's counsel sent Ms. Soto, Mr. Reece and

USAA a video-recording made February 10, 2016 of Dr. Nichols displaying and

explaining the MRI of July 18, 2014 and the structural damage to Ms.

Marschner's knee that was not present on the 12/3/15 MRI and was entirely

consistent with the facts of the May 10 collision, the mechanism of the injury and

Ms. Marschner's symptoms and physical exams since the May 10 collision.

83.    On March 30, 2016, plaintiff's counsel sent a follow up letter to USAA and
Ms. Soto, stating that: "Dr. Nichols' evidence clearly establishes that the
implosion of her femoral condyle, which necessitated the knee replacement, was
a result of the subject collision."  The letter requested USAA to "Please concede
that the remaining med pay limits are available for expenses related to the knee
replacement without further delay."

84.    A further follow up letter was sent by plaintiff's counsel to USAA and Ms.
Soto on April 20, 2016.

85.    At a time after April 15, 2016, Ms. Soto and USAA produced to plaintiff's
counsel a document purporting to be a review by Ankush K. Bansal, M.D., who
was not otherwise identified as to specialty, qualifications or affiliation.  The
review was for treatment between December 22, 2014 and March 15, 2015.  The
reviewer recommended that the treatment was not medically necessary.  The
stated rationale for the reviewer's conclusion is as follows:

> "On 12/2/14, claimant *underwent right total knee replacement.  This was
> not for trauma due to the accident but rather chronic degeneration.*
> Therefore, the surgery and and any treatment after the surgery, including
> physical therapy, was unrelated to the accident.  The appeal of 2/19/16
> was reviewed and rejected.  *Statements are irrelevant.*  The medical
> evidence does not support the assertion of relatedness.

86.    This passage gives no indication that Dr. Bansal did anything with Dr.
Nichols' explication of the MRIs other than disregard it, iscompletely inconsistent
with the evidence presented by Dr. Nichols and Dr. Wertz, and is without any
basis or explanation.

87.    On April 25, 2016, counsel for plaintiff wrote to USAA and Ms. Soto
pointing out some of the crucial deficiencies in the review from Dr. Bansal,

15

requesting clarification on certain specific points, and requesting an explanation

for how USAA could continue to deny the claim in view of Dr. Nichols' video

presentation of the MRI evidence.

88.    On or after July 1, 2016, USAA sent plaintiff's counsel a document dated

July 1, 2016, which characterized itself as a 2nd appeal review for medical

necessity and duration of care for services on and after 12/22/14.  This was

accompanied by a separate signature page bearing the electronic signature of

Mark S. Lebovits, M.D. identified only as "Internal Medicine – Anesthesiology."

Under documentation reviewed, the reviewer listed "2nd Appeal review as per

adjuster annotations dated 4/12/16."

89.    The Lebovits review recommended that the post-surgical services and

therapy was not medically necessary.  The stated basis for decision, other than

recitation of course of treatment, included, "Previous reviews have not related the

total knee arthroplasty to the accident of record, which is why postoperative

physical therapy was similarly denied."  The reviewer noted:

> "All of these services, however, require one to conclude that the right total
> knee replacement (TKR) is related to the accident of 5/10/14.  And, one
> concludes that the TKR is not related to the accident of record, none of the
> submitted PT codes would be considered to be medically reasonable,
> necessary, and related to the injury of 5/10/14.

90.    The reviewer continued:

> I reviewed documentation submitted by Dederberg (sic) Law Firm and
> from Boulder Bone and Joint, dated 5/15/16 (sic).  In that letter, *Dr. Wertz*
> *notes that avascular necrosis of the medial femoral condyle developed*
> *after the motor vehicle accident, which was the direct cause of the need*
> *for arthroplasty.*  However, it is also *noted that the claimant's pre-morbid*
> *condition included a history of arthroscopic* partial medial meniscectomy
> and chondroplasty, *which would also place the injured insured at risk for*
> *progression to end-stage osteoarthritis.*

16

*To be clear, I have not been provided with, nor did I review, any video files.*

*In the absence of documented absence of degenerative joint disease at the time of prior surgery, there is insufficient evidence to relate the need for total knee arthroplasty to the accident of record. …*

91.   This analysis is patently unreasonable.  In essence, this reviewer is claiming that anyone who has any evidence of degenerative joint disease will probably eventually progress to have a knee replacement, which is clearly incorrect.

92.   According to this reviewer, anyone with any degree of pre-existing degenerative changes could never be compensated for catastrophic knee damage requiring immediate knee replacement.

93.   These propositions are completely inconsistent with any reasonable standards of medical or legal causation, or with USAA's obligations under the terms of the policy.

94.   Further, there is no indication that this reviewer is qualified to render any opinions about the likely progression of a pre-existing knee condition or the probability or improbability or timing of a knee replacement in the absence of the obvious damage done in the collision that necessitated Ms. Marschner's knee replacement.

95.   No reasonable person would accept the opinion of an internist-anesthesiologist over the opinion of an orthopedic surgeon as to likely progression of a degenerative condition, the likelihood an unlikelihood of knee

17

replacement surgery if the collision injury had not occurred, or the nature of the damage that occurred in this collision and required prompt knee replacement.

96.    The review by Dr. Lebovits does not provide a reasonable basis for denial of medical payments for the treatments he reviewed or for any other payments denied by USAA.

97.    Defendant never reviewed its initial incorrect conclusion that the knee replacement surgery was not caused by the May 10, 2014 collision.

98.    The evidence presented in the video recording of Dr. Nichols was dramatic, obvious and clear enough that any reasonable person engaged in the business of insurance, with or without a physician review, can see severe damage to Ms. Marschner's knee and could not avoid the conclusion that the damage resulted from the collision of May 10, 2014

99.    At all material times, Colorado Revised Statute 10-3-1115 was and is in force and effect, and provides in pertinent part:

> 1. A person engaged in the business of insurance shall not unreasonably delay or deny payment of a claim for benefits owed to or on behalf of any first-party claimant. …
>
> 2. Notwithstanding section 10-3-1113 (3), for the purposes of an action brought pursuant to this section and section 10-3-1116, an insurer's delay or denial was unreasonable if the insurer delayed or denied authorizing payment of a covered benefit without a reasonable basis for that action.

100.    At all material times, Colorado Revised Statute 10-3-1116 was and is also in force and effect, and provides in pertinent part:

> 1. A first party claimant as defined in section 10-3-1115 whose claim has been unreasonably delayed or denied may bring action in a district court to recover reasonable attorney's fees and court costs and two times the covered benefit.

18

101.    As the named insured under the policy providing Medical Payments and Uninsured Motorist coverage, the plaintiff is a first party claimant within the meaning of the above-cited statue.

102.    The denial of medical payments benefits for the knee replacement surgery and associated medical and rehabilitation expenses was contrary to the overwhelming evidence provided by plaintiff and was without any reasonable basis.

103.    The amount of medical payments benefits unreasonably denied is approximately $65,837.61.

104.    Plaintiff Victoria Marschner is therefore entitled to damages from the defendant USAA, on this Third Claim for Relief, in addition to contractual damages on the First Claim for Relief, the sum of approximately $131, 675.22 plus attorney's fees and court costs.

## FOURTH CLAIM FOR RELIEF
### Claim Pursuant to C.R.S. 10-3-1115 and 1116 for Unreasonable Delay and Denial of Uninsured Motorist Benefits

105.    Plaintiff incorporates by reference paragraphs 1 through 104 of her Complaint.

106.    On or about June 2, 2015, Country Financial agreed to tender its Bodily Injury Liability Limit on behalf of its insured Nicholas D. Nather.

107.    On June 3, 2015, USAA authorized the plaintiff to settle her bodily injury claim against Nicholas J. Nather and Country Financial.

108.    On or about June 23, 2015, plaintiff's counsel provided USAA's adjuster assigned to the UIM claim, Glen J. Reece, a list of all of the plaintiff's medical

19

providers related to the May 10, 2014 collision and a signed medical records release.

109.    Defendant had complete access to all of plaintiff's medical records, including those quoted and cited herein, at all material times.

110.    Commencing with initial communications concerning the UIM claim, the said Mr. Reece failed and refused to concede, for purposes of discussion of the value of the UIM claim, that the plaintiff's knee replacement was caused by the May 10, 2015 collision.

111.    The failure of USAA to acknowledge that its insured, Victoria Marschner's knee replacement was caused by the May 10, 2015 collision was without a reasonable basis.

112.    The failure of USSA to acknowledge the knee replacement was caused by the May 10, 2015 collision in and of itself resulted in a delay of any payments under the UIM coverage.

113.    Mr. Reece and USAA failed to ever provide any basis for their refusal to acknowledge causation of the knee replacement, other than the fact that she had pre-existing arthritic changes and a prior cartilage removal surgery. Mr. Reece and USAA, in their handling of the Uninsured Motorist Coverage claim, never provided any evidence that the pre-existing knee condition would ever result in knee surgery, let alone in the immediate time frame in which knee replacement became necessary due to damage suffered in the May 10 collision. Two copies of the video were sent, one to Ms. Soto and one to Mr. Reece.

114.    Plaintiff's counsel provided Mr. Reece and USAA, directed to the

Marschner underinsured motorist claim, the correspondence and attachments described throughout this Complaint, including that described in paragraphs 77 through 82.

115.    On February 24, 2016 and March 25, 2016, as they had done every month, Mr. Reece and USAA sent Ms. Marschner, care of her attorney, form letters that were not specific to any activity on the claim and were not responsive to Ms. Marschner's attorney's communications of December 29, 2015 and February 19, 2016.

116     On March 30, 2016, plaintiff's counsel wrote to Mr. Reece and USAA, reminding them of the Dr. Nichols' video and informing them as follows:

> I asked that you acknowledge, for purposes of Ms. Marschner's UIM claim, that her knee replacement was caused by the collision so that we can evaluate her claim accordingly.
>
> It has been well over a month since my letter, which is ample time to respond in a (sic) view of the nature of the evidence. Still, I have received absolutely no response from you.
>
> Your failure to respond to my presentation of evidence that should resolve a major threshold issue is delaying resolution of this UIM claim.

117.    On April 25, 2016, Mr. Reece and USAA send plaintiff's counsel another meaningless and non-responsive form letter.

118.    On April 25, 2016, plaintiff's counsel submitted to Mr. Reece and USAA a complete demand package, with medical records, bills and a discussion of and specific citations to the evidence. The letter demanded payment under the UIM coverage of the limit of $300,000, subject to the condition that there is no UIM umbrella coverage.

119.    In the April 25, 2016 letter, plaintiff's counsel critiqued the Sthalekar

21

review, discussed in paragraphs 62 through 66, above,

120.    Dr. Sthalekar's statement consisted of an elementary level, boiler plate description of the based indication for total knee replacement, and then stated, as the entirety of his analysis: "However, in this case the diagnosis of osteoarthritis is not secondary to the motor vehicle accident."

121.    Plaintiff's counsel further informed Mr. Reece and USAA, in the April 25, 2016 letter, that this analysis from Dr. Sthalekar provided no reasonable basis for denying causation of Ms. Marschner's knee surgery.

122.    On April 29, 2016, Mr. Reece and USAA send plaintiff's counsel an acknowledgment that the April 25 settlement packet has been received.

123.    On May 17, 2016, Mr. Reece and USAA sent a letter to plaintiff's counsel requesting an extension of time to respond to the settlement demand (which by its terms was open for 30 days). Plaintiff's counsel agreed to extend the demand until June 9.

124.    On June 8, 2016, Mr. Reece and USAA, in purported response to plaintiff's demand due June 9, 2016, requested the records of Dr. Hillary Browne, M.D., the primary care physician, back to 2011.

125.    The records of Dr. Browne going back to 2011 were within the scope of the medical records authorization provided to USAA in June 2015.

126.    On June 14, 2016, plaintiff's counsel responded to the June request, protesting that the PCP's records were unlikely to be relevant as they would have less detail about an orthopedic condition that the orthopedist and the previous MRI, and protesting USAA's delaying tactics, but agreeing to obtain the records.

127.    On July 7, 2016, plaintiff's counsel provided all arguably pertinent records from Dr. Browne, and a privilege log for the balance of Dr. Browne's file. The July 7 letter also admonished USAA for its apparent delaying tactics and re-opened the policy limits demand for 10 days.

128.    On July 26, 2016, Mr. Reece and USAA conveyed an offer of $130,000, saying only: "We believe this offer represents the fair value of the claims," and providing no other explanation whatsoever.

129.    On August 11, 2016, plaintiff's counsel wrote to Mr. Reece and USAA, acknowledging the $130,000 offer and asking: "Could you kindly explain the basis for USAA's valuation of the claim at $130,000?" The entire substance of that response was:

> We are writing in follow up to your letter dated, 8/11/16 and your client, Victoria Marschner. Our offer of $130,000 for your client's injury claim is based on all the medical bills, medical records, and all the additional documentation provided by your office for Ms. Marschner.

130.    On August 15, 2016, plaintiff's counsel wrote to Mr. Reece and USAA noting the immediacy and lack of substance of USAA's August 11 response. The August 15 letter asked a series of basic questions about how USAA arrived at its valuation. The letter concluded:

> I am asking these questions because, as you know, I believe the evidence requires payment of the full UIM limits of $300,000. Your offer of $130,000 represents a denial of the remaining $170,000 of the UIM limit. I am not aware of any reasonable basis for denial of the UIM benefits between $130,000 and $300,000. My questions are intended to provide USAA an opportunity to articulate a reasonable basis for withholding $170,000 of the UIM policy limit, if USAA claims there is a reasonable basis. I look forward to USAA's substantive and meaningful response to this inquiry.

131.    On August 15, 2016, Mr. Reece and USAA responded to plaintiff's

23

August 15, 2016 inquiry as follows:

> We are writing in follow up to your letter dated, 8/15/16 and your client,
> Victoria Marschner. Our offer of $130,000.00 for your client's injury claim
> is based on all medical bills, medical records and all the additional
> documentation provided by your office for Ms. Marschner.

132.    Defendant thereby failed and refused to provide any explanation for its

rationale or any basis, reasonable or otherwise, for denying the remaining

$170,000 of its Underinsured Motorist bodily Injury limit.

133.    On August 16, 2016, plaintiff's counsel wrote to Mr. Reece and USAA

requesting that USAA tender the undisputed amount without conditions other

than acknowledgment of receipt of the $130,000.

134.    On August 17, 2016, USAA tendered $130,000 as "undisputed settlement

payment" under its Uninsured Motorist Bodily Injury coverage.

135.    The facts recited above demonstrate that payment of the $130,000 was

unreasonably delayed without a reasonable basis for doing so by USAA's

prolonged refusal to concede causation of Ms. Marschner's knee replacement

and other delaying tactics described above.

136.    The balance of the Uninsured Motorists Bodily Injury coverage in the

amount of $170,000 was, and continues to be unreasonably denied without any

reasonable basis for doing so.

137.    The amount of Uninsured Motorist Coverage unreasonably delayed or

denied, if there is no umbrella uninsured motorist overage, is $300,000.

138.    Therefore, pursuant to C.R.S. 10-3-1116, on this Fourth Claim for Relief

plaintiff is entitled, in addition to payment of the balance of the policy limits

sought in the Second Claim for Relief, to payment from defendant USAA of

$600,000, plus attorney's fees and court costs.

Wherefore, plaintiff Victoria Marschner respectfully prays this Court for an award of damages against the defendant USAA Casualty Insurance Company as follows:

1. On her First Claim for Relief, Medical Payments benefits in the amount of $65,837.61

2. On her Second Claim for Relief, underinsured motorist benefits of $170,000;

3. On her Third Claim for Relief, statutory damages of $131,675.22, plus attorney's fees and costs;

4. On her Fourth Claim for Relief, statutory damages of $600,000 plus attorney's fees and costs;

5. All together with interest to the maximum extent allowed by law, costs including expert witness fees and deposition expenses, and such other and further relief as the Court may deem appropriate.

Dated this 13th day of December, 2016

CEDERBERG LAW FIRM, P.C.

ATTORNEY FOR PLAINTIFF
James A. Cederberg, #8920
1200 28th Street, Suite 302
Boulder, CO 80303
303-499-0449
303-499-0542 (Fax)

25

Plaintiffs' address:

Victoria Marschner
1510 Ithaca Dr.
Boulder, CO 80305